# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICK LALONDE, | No. 2:24-cv-01781-DSF-MBK |
| Plaintiff, | Findings of Fact and Conclusions of Law After Court Trial on the Administrative Record |
| v. | |
| METROPOLITAN LIFE INSURANCE COMPANY, | |
| Defendant. | |

## I. Introduction

Plaintiff Rick LaLonde brings this action pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*., to challenge Defendant Metropolitan Life Insurance Company's (MetLife) denial of his continued long-term disability (LTD) benefits. A court trial on the administrative record was held on February 25, 2025. After consideration of the parties' trial briefs, oral arguments, and the evidence in the Administrative Record,[1] the Court makes the following findings of fact and conclusions of law.

---

[1] The Court refers to pages from the Administrative Record as "AR ___."

## II. Findings of Fact[2]

### A. The Plan

LaLonde is a former employee of Providence Health & Services (Providence), which established an ERISA-governed plan that provides LTD benefits to eligible employees (the Plan).  Dkt. 30-1 ¶ 2; Dkt. 31-1 ¶ 2.  The group disability insurance policy that funds the Plan's LTD benefits is issued by MetLife.  Id.  MetLife also acts as the fiduciary responsible for adjudicating claims for LTD benefits under the Plan.  Id.; PLAN 0058-0061.[3]  At all relevant times, LaLonde was a participant in the Plan as a benefit of his employment with Providence.  Dkt. 30-1 ¶ 2; Dkt. 31-1 ¶ 2.

The Plan provides monthly LTD benefits, after a 180-day elimination period, to participants that are disabled under the terms of the Plan.  PLAN 0021.  The Plan defines "disabled" or "disability" as follows:

[D]ue to Sickness or as a direct result of accidental injury:

- You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and

- You are unable to earn:

    o during the Elimination Period and the next 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy; and

---

[2] Any finding of fact deemed to be a conclusion of law is incorporated into the conclusions of law.  Any conclusion of law deemed to be a finding of fact is incorporated into the findings of fact.  Where the Court declined to adopt a fact submitted by a party, the Court found the fact was either unsupported, unnecessary, or irrelevant to its determination.

[3] The Court refers to pages from the Plan's policy documents (Dkt. 26) as "PLAN ___."

> - after such period, more than 60% of your Predisability Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.

Id. at 0023.

The Plan also limits LTD benefits to 24 months for disabilities due to alcohol, drug, or substance abuse or addiction and for disabilities due to mental or nervous disorders or diseases. Id. at 0046.

**B.     LaLonde's Employment**

LaLonde was employed in the medical field from 1991 until he stopped working on February 23, 2017 due to his health conditions. AR 3987. The last position LaLonde held was at Providence as Manager of the Sterile Processing Department. AR 4355-4356. In that role, LaLonde was responsible for managing the Sterile Processing Department; interpreting policies, procedures, standards and regulations as was appropriate to personnel/nursing and medical staff; and overseeing the activities of the department's supply personnel regarding the stocking and furnishing of sterile and non-sterile supplies and equipment. AR 3728-3729.

**C.     LaLonde's Medical Condition**

On February 22, 2017, LaLonde was involved in a hit and run automobile accident on his way to work. Id. at 3772. After the accident, LaLonde was treated by John Villanueva, M.D., a specialist in pain management, and Criselda Abad-Santos, M.D., a psychiatrist. Id. at 3702. LaLonde was also treated by Sun Lee, MD., a neurosurgeon. Id. at 3028.

LaLonde was first treated by Dr. Villanueva on March 17, 2017. Id. at 3286. After that examination, Dr. Villanueva's assessment was that LaLonde's clinical symptoms and physical exam findings were suggestive of lumbar and cervical radiculopathy. Id. at 3295. Because of these findings, he referred LaLonde for cervical and lumbosacral

MRI without contrast. Id.  After his MRI, LaLonde had another appointment with Dr. Villanueva.  In his SOAP note from that April 26, 2017 appointment, Dr. Villanueva stated that LaLonde was "present[ing] with symptoms and clinical findings concerning for a lumbar radiculopathy," which he concluded "correlates with [LaLonde's MRI] imaging."  Id. at 3303.  At that time, Dr. Villanueva prescribed eight sessions of physical therapy.  Id.

After he completed physical therapy, see id. at 3335, LaLonde had another appointment with Dr. Villanueva.  Id. at 3319.  At that June 12, 2017 appointment, Dr. Villanueva prescribed LaLonde a Quad Cane for better stability during ambulation—LaLonde had previously been using a single point cane—and stated that, based on his findings, LaLonde may benefit from lumbar epidural steroid injections to help reduce pain and inflammation and restore range of motion with the hope of avoiding surgery.  Id. at 3323.

However, LaLonde was ultimately unable to avoid spinal surgery. Based on a diagnosis of severe spinal stenosis and spondylolisthesis with severe compression on the nerve roots, on August 7, 2017, Dr. Lee performed a total laminectomy L4/L5 and bilateral decompression and fusion from L4 to L5 on LaLonde.  Id. at 2838-2839.

After the accident, LaLonde also received ongoing mental health treatment from Dr. Abad-Santos, who had been his psychiatrist since December 2016, for diagnoses of major depressive disorder, post-traumatic stress disorder, and panic disorder.  Id. at 1870-1918.

## D.    MetLife's Initial Approval of LaLonde's Claim

In July 2017, LaLonde submitted a claim to MetLife for LTD benefits, listing February 22, 2017 as the date he had last worked.  Id. 3702-3703.  In that application, LaLonde represented that he was prevented from performing the duties of his job because he was unable to walk freely or lift with work restrictions.  Id. at 3702.  During its review of LaLonde's claim, MetLife requested and received LaLonde's medical records, as well as Attending Physician Statement (APS) forms by Drs. Villanueva, Abad-Santos, and Lee.

In the APS form submitted by Dr. Villanueva, LaLonde's pain management specialist, Dr. Villanueva diagnosed LaLonde with lumbar radiculopathy and cervical radiculopathy/spine degeneration. Id. at 3698. That APS form also stated that LaLonde's self-reported symptoms included muscle spasms, leg pain, and weakness, and that Dr. Villanueva's clinical findings included weakness and decreased range of motion, limited due to pain. Id. Dr. Villanueva recommended physical therapy and possibly an evaluation with a spinal surgeon. Id. at 3699. Dr. Villanueva stated that he had advised LaLonde to stop working on March 17, 2017 (the date of their first appointment), and that he anticipated LaLonde would be able to return to modified duty work on December 7, 2017, with the following restrictions: work no more than 6 hours a day with 5-minute breaks every hour and no lifting, pulling, or pushing over 10 lbs. Id. at 3700.

LaLonde's psychiatrist, Dr. Abad-Santos, also submitted APS forms to MetLife. Id. at 3634-3639. On those APS forms, Dr. Abad-Santos listed major depressive disorder, recurrent; panic disorder; and post-traumatic stress disorder (PTSD) as LaLonde's diagnoses. Id. at 3635, 3637. Dr. Abad-Santos stated that LaLonde was unable to work as of February 23, 2017, and that she anticipated that LaLonde would be able to return to work on May 17, 2017 if he had no "destabilization or setbacks." Id. at 3637. In describing her rationale for recommending that LaLonde stay home from work, Dr. Abad-Santos stated that he was "complaining of depressed mood, anxiety, insomnia, panic attacks, avoidance of reminders about the abuse [he had previously suffered], hypervigilance, exaggerated startle response, problems with memory and concentration." Id.

MetLife also received an APS form from Dr. Lee, LaLonde's orthopedic surgeon. Id. at 3028-3031. Dr. Lee diagnosed LaLonde with spondylolisthesis L4-L5 level and spinal stenosis. Id. at 3029. Dr. Lee stated that LaLonde had undergone spinal surgery on August 7, 2017—a total laminectomy at L4-L5 with bilateral decompression and L4-L5 fusion—and that he anticipated LaLonde would be unable to work until November 17, 2017. Id. at 3030-3031.

Based on its review of LaLonde's medical records and other evidence submitted, MetLife approved LaLonde's LTD claim.  Id. at 3015-3017.  MetLife notified LaLonde by letter dated August 31, 2017 that his claim was approved starting on February 23, 2017, and his benefits were payable as of August 22, 2017 following the Plan's mandatory 180-day elimination period.  Id.

**E.    MetLife's Ongoing Review of LaLonde's Claim**

After MetLife approved LaLonde's claim, it periodically requested and received updated medical records and APS forms to assess LaLonde's ongoing entitlement to benefits.  See id. at 2927, 2871-2926, 2807, 2825-2828, 2831-2922, 2721-2774.

In March 2018, MetLife ordered physical on-site and social media surveillance.  Id. at 3954-3956.  During that surveillance, the MetLife Special Investigations Unit (SIU) observed LaLonde driving himself to a few brief errands without assistance.  The SIU noted that LaLonde "utilized a walking cane for support as he moved about on [those] date[s] and also appeared to enter and exit his vehicle slowly."  Id. at 2648.  On one of those occasions, LaLonde was observed pushing a shopping cart at Walmart and placing grocery bags into his vehicle.  Id.

On March 21, 2018, after three days of surveillance, the SIU closed LaLonde's investigation.  Id. at 2648-2649.  From a physical standpoint, the SIU concluded that "activity observed during efforts appears consistent with [LaLonde's] stated physical condition."  Id. at 2649.  From a mental standpoint, the SIU noted that LaLonde's restrictions and limitations "indicate that he requires a support person when shopping, etc.," but he had been observed shopping at Walmart without a support person.  Id.  The SIU discussed conducting an in-person interview, but his claim manager "did not feel it was necessary at [that] point."  Id.

**1.    Psychiatric Conditions Claim Review**

In March 2018, MetLife also referred LaLonde's claim for clinical psychiatric assessment.  Id. at 3979.  On March 8, MetLife psychiatric

clinical specialist William Morgan, Licensed Marriage and Family
Therapist (LMFT), conducted a clinical interview with LaLonde. Id. at
3974. During that phone interview, LaLonde stated that he was unable
to return to work because his job would not work with his restrictions,
he was still falling and struggling with balance, and he was suffering
from "paranoia about driving," "constant anxiety," reduced attention
span, and an inability to concentrate. Id. at 3976-3978. LaLonde also
stated that he was struggling to stay on top of paying his bills, could go
a week without showering, was anxious about socializing, and did not
want to leave the house. Id. After the interview, Morgan called Dr.
Abad-Santos and left her a voicemail informing her that LaLonde had
made statements during the interview expressing suicidal ideation;
that he had a plan, but no intent; and that he had promised to contact
the police or his psychiatrist if he felt as though he might act on his
suicidal ideation. Id. at 3974.

Morgan referred LaLonde's file for physician consultant review,
which was conducted by psychiatrist Elbert Greer Richardson, M.D. on
May 7, 2018. Id. at 2569. Following a paper review of LaLonde's file,
Dr. Richardson concluded that the medical information did not support
functional limitations, defined as "any reduction in ability to work full
time," beyond March 1, 2018. Id. at 2571. Having determined that no
psychiatric restrictions or limitations were warranted, Dr. Richardson
explained the basis for his conclusion as follows:

> A review of the medical record yields evidence that the
> claimant presents with a history of PTSD, Panic Disorder,
> Depression and Alcohol Use Disorder. The claimant
> continues to present with subjective complaints of an
> inability to work due to insomnia, social withdrawal,
> feelings of worthlessness and helplessness, poor
> concentration, psychomotor retardation, panic attacks,
> avoidance of reminders of physical abuse by ex-partner,
> hypervigilance, exaggerated startle, nightmares and
> flashbacks. However, the clinical evidence does not support
> global psychiatric impairment that would preclude
> occupational functioning. There is no evidence that

symptoms were documented and tracked with screening measures such as BAI, BDI-11, GAD7, PHQ, or cognitive screenings to document and track cognitive symptoms such as MoCA, MMSE, full formal MSE.  The claimant's mental status was clinically recorded to be within functional limits since October 2017 by Dr. Santos, MD (Psychiatry).  It appears, though, that Dr. Santos' recommendation for continued "*disability*" is being made primarily upon the basis of subjective complaints without clinical documentation.  Furthermore, there are no indicators of psychiatric severity that would warrant occupational restrictions, such as active suicidality or homicidality, suicide attempts, psychosis, or psychiatric hospitalizations.  Specifically regarding Alcohol Use Disorder, most recent documentation indicates that claimant is in early remission and as such no restrictions and limitations are warranted for this diagnosis in the specified time period.  Specifically regarding surveillance, there is no surveillance that yields pertinent psychiatric evidence.  If there is additional surveillance that features evidence of psychiatric impairment, I would be happy to review it and alter my opinion, if warranted.

Id.

As "pertinent documentation," Dr. Richardson listed three of Dr. Abad-Santos' provider notes from appointments in late 2017 (October 26, November 22, and December 21), which each "note[d] a functional mental status and continued sobriety."  Id.  Dr. Richardson left two messages with Dr. Abad-Santos' office but received no response.  Id. at 2569.  MetLife also faxed Dr. Richardson's evaluation to Dr. Abad-Santos but again received no response.  Id. at 2568.

MetLife concluded that, from March 18, 2018 forward, LaLonde's claim was no longer supported for a psychiatric condition, and benefits continued exclusively for LaLonde's physical conditions.  Id. at 4103-4106.

8

### 2.    Physical Conditions Claim Review

MetLife continued its review of LaLonde's claim as to his physical conditions, sending letters to LaLonde, Dr. Villanueva, and Dr. Lee requesting updated information.  Id. at 2374-2393, 2491-2509.  Dr. Lee provided an office note from a February 9, 2018 follow-up appointment. Id. at 2372.  In the note, Dr. Lee stated that he had informed LaLonde he could not complete the temporary disability form because the operation had been about six months earlier.  Id.

On September 5, 2018, LaLonde informed MetLife he was no longer treating with Dr. Villanueva and Dr. Lee due to a change in his health insurance plan.  Id. at 4178.  LaLonde stated that he was now treating with Phyllis Cohen, M.D., a specialist in family medicine and HIV, and that Dr. Cohen had referred him for neurology, pain management, physical therapy, and radiology.  Id.  In an APS form dated September 13, 2018, Dr. Cohen reported that she had been treating LaLonde since May 2, 2018.  Id. at 2303.  On that APS form, Dr. Cohen listed a diagnosis of chronic low back pain, symptoms of low back pain and gait disturbance, and the following clinical findings: walks with a cane, lumbar pain to palpitation, and unsteady gait.  Id. Dr. Cohen advised LaLonde not to return to work and imposed on him the following restrictions and limitations: sit no more than 4 hours continuously; stand no more than 2 hours intermittently; walk no more than 1 hour continuously; perform continuous eye/hand movements no more than 1 hour continuously; and no climbing, twisting, bending, stooping, reaching above shoulder level, reaching to the front or to the side at desk level, fine finger movements, lifting or carrying, or pushing or pulling.  Id. at 2304.

In a clinical assessment conducted on October 5, 2018, the nurse reviewer concluded that the restrictions and limitations outlined in Dr. Cohen's September 13, 2018 APS form were medically supported and that LaLonde could not return to work.  Id. at 4230-4238.  The reviewer also opined that LaLonde "may need an additional 4-5 months for recovery" before he could be expected to return to work.  Id. at 4232.

MetLife continued to approve LTD benefits for LaLonde based on his physical conditions.  Id. at 4244.

**F.    MetLife's Termination of Benefits**

On January 7, 2019, MetLife notified LaLonde by letter that it was reviewing his continued eligibility for LTD benefits under the Plan's definition of disability.  Id. at 2236-2264.  The letter explained that MetLife had previously determined LaLonde was disabled under the Plan's definition of disability, and that he would continue to receive benefits through August 21, 2019 only if he remained disabled from performing his own occupation.  Id. at 2236.  The letter also explained that, to continue to receive benefits after August 21, 2019, MetLife needed to determine that LaLonde was disabled from any gainful occupation under the Plan's definition of disability.  Id.

On April 1, 2019, MetLife received a Power of Attorney (POA) that was executed in December 2018, and by which LaLonde appointed Judith Weyant as his POA.  Id. at 2195-2203.  MetLife claims specialist April Cloutier had spoken with Weyant by phone on March 29, 2019, and on that call Weyant had stated that LaLonde is unable to maintain any one physical position (i.e., sitting, standing, laying down) and was being treated by Daria Younessi, M.D. (family medicine) and Abraham Argun, Psy.D. (forensic clinical psychology).  Id. at 4282-4283.  Weyant also represented that LaLonde lives alone, can run simple errands, orders groceries online, and uses a walker and cane to mobilize.  Id.

Upon receiving Dr. Argun's records on April 9, 2019, see id. at 2157-2167, MetLife learned LaLonde had been arrested and charged with attempted murder on November 11, 2018.  He was convicted and sentenced to five years in prison, id. at 112-113.

On April 10, 2019, MetLife referred LaLonde's file for physician review by consultant Mahdy Flores, D.O., who is board-certified in family medicine and occupational medicine.  Id. at 2146.  Following a paper-only review of LaLonde's file, Dr. Flores concluded that the medical information did not support functional limitations, defined as "any reduction in ability to work full time," beyond April 10, 2019.  Id.

at 2148.  Having determined no physical restrictions or limitations were warranted,[4] Dr. Flores explained the basis for his conclusion, in part, as follows:

> We can see that there is a decrease in [LaLonde's] lumbar pain after the [total laminectomy] operation.  At the same time, there is no mention of muscle weakness or movement limitation in the last medical examinations.  Other diseases/complaints of the claimant are under control or temporary conditions and there are no functional limitations.  The claimant's surveillance findings from March of 2018 identified him utilizing a cane, but able to walk, drive, shop, push a shopping cart and put items in a car trunk.  Using a cane is significant, but I am unable to concur this with the medical information, as there is no established motor/sensory deficit, gait/balance loss to require assistive devices. . . . The claimant per the recent records, which are subsequent to surveillance findings, has no focal neurological deficit.

Id. at 2149.

MetLife sent a copy of Dr. Flores' report to Dr. Younessi and Dr. Cohen.  Id. at 2131-2150.  Dr. Cohen did not respond.  Id. at 1802.  On May 16, 2019, Dr. Younessi responded, informing MetLife that "the clinical picture does not support [Dr. Flores'] findings" and requesting a brief extension to keep LaLonde's claim open because "[i]t would be medically prudent to repeat an MRI of the lumbar spine as it has been two years since the last one."  Id. at 1932.  MetLife did not provide the requested extension.  Id. at 1802.

After Dr. Flores completed his review, MetLife received medical records from Dr. Abad-Santos reflecting appointments from December 21, 2016 through October 31, 2018, as well as medical records from the

---

[4] Dr. Flores deferred review of LaLonde's psychiatric disorders "to a more appropriate specialty reviewer."  AR 2149.

Los Angeles County Jail reflecting consultations from November 11, 2018 through May 18, 2019.  Id. at 1832-1867, 1868-1918.  On June 5, 2019, MetLife's psychiatric clinical specialist reviewed those records and concluded that they did not reflect any severe or debilitating psychiatric symptoms at the present time and that the barrier to LaLonde's return to work was not psychiatric, but rather was due to his incarceration.  Id. at 4405.  On June 18, 2019, a clinical nurse consultant reviewed the additional records and concluded that they did not support an ongoing physical disability because there were "no exam findings, diagnostics, or dictated notes" regarding LaLonde's physical condition and they reflected that an April 22, 2019 x-ray of LaLonde's right hip was "essentially normal."  Id. at 4419-4420.

In a letter dated June 24, 2019, MetLife notified LaLonde it would not approve benefits on his claim beyond June 25, 2019.  Id. at 231-235.  The letter stated that MetLife had "determined that [he] no longer satisf[ies] the definition of disability as [he is] not disabled from performing [his] own occupation or any occupation according to the Plan."  Id. at 233.

## G.    LaLonde's Appeal

On October 4, 2022, LaLonde contacted MetLife, informing it that he had recently been released from jail and asking what he needed to do so that his claim could be reinstated.  Id. at 4447.  LaLonde later submitted to MetLife medical records and APS forms by his current providers at Tarzana Treatment Centers, Michael Soles, M.D., internal medicine, and Nicholas Hermann, PA-C, as well as a Behavioral Health Assessment completed by Dr. Abad-Santos.  Id. at 1698-1725.  LaLonde advised MetLife he had been approved for Social Security Disability Insurance (SSDI) benefits by the Social Security Administration (SSA).  Id. at 238-241.  On May 19, 2023, LaLonde submitted to MetLife a formal written appeal.  Id. at 215-216.[5]

---

[5] MetLife agreed to review LaLonde's appeal even though it was submitted beyond the deadline for appeal.

MetLife sent LaLonde's file back to Dr. Flores to determine whether the newly submitted records would change his opinion.  Id. at 193-202.  In a report dated May 22, 2023, Dr. Flores concluded that "the evidence does not suggest that [LaLonde] suffers from a medical condition or combination of conditions of such severity to warrant the placement of restrictions or limitations on his activities" from June 19, 2019 to the present.  Id. at 199.  Dr. Flores again noted that LaLonde's psychiatric conditions were "beyond the scope of [his] review."  Id.  Dr. Flores explained the basis for his conclusion, in part, as follows:

> The claimant enters medical examinations wearing a back brace, with the use of a walker or cane.  However, the claimant has good muscle tone and good muscle strength, with a steady gait.  It has also been evidenced that the claimant has the ability to walk without the use of assistive devices.  The claimant has no physical limitations with good range of motion, is able to perform his daily activities, has no red flags and no indication for new imaging to evaluate his bone structure. . . . Therefore, despite the claimant's ongoing reported symptoms, in the absence of clinically evident deficits, restrictions are not warranted for the timeframe under review.

Id. at 200.

MetLife sent Dr. Flores' report to Dr. Soles and PA Hermann for their review, but received no response.  Id. at 173-186.

MetLife referred LaLonde's file to another independent physician, Hossein Molazadeh, M.D., board-certified in internal medicine, as part of the appeal review.  Id. at 31-45.  In a report dated June 16, 2023, Dr. Molazadeh concluded that "the evidence does not suggest that [LaLonde] suffers from a medical condition or combination of conditions of such severity to warrant the placement of restrictions or limitations on his activities" from June 25, 2019 to the present.  Id. at 43.  In explaining the basis for his conclusion, Dr. Molazadeh acknowledged that LaLonde "continues to experience ongoing lumbar

and left leg pain," but noted that a healthcare professional had reported observing LaLonde walk with a steady gait and without an assistive device and that "no abnormal findings have been observed on physical examination." Id. at 43-44. Dr. Molazadeh summarized his conclusions as follows:

> Overall, although the claimant has medical symptoms related to spondylolisthesis, lumbar fusion in the lumbar region, hypertension (HTN), hyperlipidemia (HLD), chronic low back pain (LBP), skin dermatitis, renal mass, hearing loss, and left ankle pain, these symptoms have been controlled by medications, and there were no diagnostic tests or clinical findings to support the severity of his condition requiring restrictions and limitations as of June 25, 2019. Additionally, the surveillance report revealed significant functioning by the claimant after the date of his condition, without revealing any impairment. As such, restrictions are not warranted.

Id. at 44.

MetLife's psychiatric clinical specialist reviewed the updated medical records LaLonde submitted and suggested that the appeal be referred to an outside psychiatric professional for review. Id. at 4526-4540. Consistent with that recommendation, LaLonde's file was referred for review by independent licensed psychologist Gabriel Jasso, Psy.D. Id. at 46-66. In a report dated June 27, 2023, Dr. Jasso concluded that, considering "both the self-reported symptoms and clinical observations, the evidence does not suggest that [LaLonde] is impaired by a mental health condition or combination of conditions of such severity to warrant the placement of restrictions or limitations on his activities" from June 25, 2019 to the present. Id. at 51. In explaining the basis for his conclusion, Dr. Jasso acknowledged LaLonde's "long-standing history of Depression, Panic disorder, PTSD, and Alcohol abuse," but noted that an October 18, 2022 mental status exam "was unremarkable," and that impairments noted in a November 1, 2022 MetLife document had "no support from records, and [LaLonde]

was independently performing [activities of daily living] prior to that." Id. at 52. Dr. Jasso also noted that "the records [did] not include neurocognitive testing and there [were] no abnormalities in recent/remote memory, attention, concentration, or cognition in the available records to support" the self-reported cognitive symptoms. Id.

On June 28, 2023, MetLife sent copies of the reports from Dr. Molazadeh and Dr. Jasso to LaLonde for his review and to provide to his treating physicians. Id. at 16. On July 5 and 6, LaLonde requested that MetLife provide an extension to give his providers time to respond to the reports of the independent physicians. Id. MetLife denied both requests. Id. By letter dated July 10, 2023, MetLife notified LaLonde that it completed its review of his appeal and its final determination was that the decision to terminate his benefits beyond June 24, 2019 was appropriate. Id. at 14-18.

## III. Standard of Review

The court reviews a challenge to an ERISA plan's denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). The parties agree the proper standard of review is *de novo*.

When review is *de novo*, "the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." Muniz v. Amec Constr. Mgmt. Inc., 623 F.3d 1290, 1295-96 (9th Cir. 2010); see Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006) (en banc) (when a court reviews the denial of benefits *de novo*, the court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits"). The Court is not required to accept the conclusion of any particular treatment provider or medical file reviewer. For instance, the Court does not accord special deference to the opinions of treating physicians based on their status as treating physicians. Black

& Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Instead, opinions must "be accorded whatever weight they merit." Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (citing Black & Decker, 538 U.S. at 834). The Court may, however, give greater weight to a treating physician's opinion where it is evident a particular physician has had a "'greater opportunity to know and observe the patient' than a physician retained by the plan administrator" who conducts a file review. Id. (quoting Black & Decker, 538 U.S. at 832).

In performing a *de novo* review, the Court's "task is to determine whether the plan administrator's decision is supported by the record, not to engage in a new determination of whether the claimant is disabled." Collier v. Lincoln Life Assurance Co. of Bos., 53 F.4th 1180, 1182 (9th Cir. 2022). The Court then "must examine only the rationales the plan administrator relied on in denying benefits and cannot adopt new rationales that the claimant had no opportunity to respond to during the administrative process." Id.

A claimant challenging a plan administrator's decision bears the burden of proving entitlement to benefits by a preponderance of the evidence. See Shaw v. Life Ins. Co. of N. Am., 144 F. Supp. 3d 1114, 1123 (C.D. Cal. 2015) (citing Muniz, 623 F.3d at 1294).

## IV. Conclusions of Law

LaLonde is diagnosed with spondylolisthesis and lumbar region status post lumbar fusion. AR 31. The record reflects numerous reports of chronic and severe back and leg pain, radiating pain through the left leg, and numbness related to those diagnoses. See, e.g., AR 298, 307, 2209, 1720-1724, 2253-2254. These self-reported symptoms are supported by LaLonde's history of spinal surgery, modifications to various prescription pain medication regimes, and repeated efforts at physical therapy. See, e.g., id. at 1699-1703, 2222-2223, 2206-2207, 2254. The record also reflects that LaLonde suffers ongoing deficits in balance and mobility, as demonstrated by antalgic gait, falls, and use of assistive devices. See, e.g., id. at 307, 1699-1703, 1720-1724, 1976.

During his incarceration, the record reflects LaLonde's ongoing pain management efforts, such as using an egg crate cushion on his bunk, initiating numerous discussions with prison healthcare providers about pain medications and muscle relaxants, and filing inmate grievances complaining of inadequate medical treatment for his back and leg pain. Id. at 277, 1024, 1080-1094, 1589. The record also reflects continued mobility deficits during LaLonde's incarceration, including multiple falls and using a walker and wheelchair. Id. at 277, 298, 307, 1976. And after LaLonde was released from custody, he returned to the primary care group he had been treating with prior to his arrest, Tarzana Treatment Centers, seeking treatment for his chronic pain symptoms and receiving referrals for pain management, physical therapy, and orthopedic surgery. Id. at 1699-1703, 1720-1724.

Over the years, LaLonde's treating physicians have consistently reported that he faces disabling functional limitations from his spinal conditions and related chronic pain. Id. at 2253-2254, 2257-2260, 2303-2304, 2722-2725, 2879-2882, 2885-2887, 2922, 3028-3031, 3698-3700. Against the background of his lengthy treatment history, the Court finds it appropriate to give greater weight to the opinions of LaLonde's treating physicians, each of whom had a "greater opportunity to know and observe" LaLonde than the MetLife-retained physicians who based their opinions solely on a paper review of LaLonde's file. See Jebian, 349 F.3d at 1109 n.8; see also Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 676 (9th Cir. 2011) (finding opinions from medical provider's in-person examination of claimant more persuasive than contrary opinions from plan administrator's paper-only file review).

The conclusions of MetLife's physician consultants merit less weight not only because they "lack the level of credibility normally attributed to physicians who have personally observed a patient," Nagy v. Grp. Long Term Disability Plan for Emps. of Oracle Am., Inc., 183 F.Supp.3d 1015, 1031 (N.D. Cal. 2016), but also because they failed to meaningfully grapple with either the contrary reports in LaLonde's medical records or the contrary conclusions of LaLonde's treating physicians, who had personally examined him. For example, Dr. Flores concluded that the medical information did not support *any* physical

17

functional limitations without even acknowledging the restrictions and
limitations that had been advised by LaLonde's treating physicians, let
alone indicating the basis for his disagreement. See AR 2149. And Dr.
Molazadeh's report highlighted one healthcare professional's conclusion
that LaLonde "didn't appear to need a walker" and broadly asserted
that, despite his ongoing lumbar and left leg pain, "no abnormal
findings" were observed on LaLonde's physical exams, id. at 43, but
failed to address the fact that multiple physicians affirmed LaLonde's
need for an assistive device and documented abnormal clinical findings,
including unsteady gain, lumbar pain on palpitation, pain with back
movement, and weakness. Compare AR 43 (Molazadeh Report), with
AR 2253-2254 (February 4, 2019 progress note by Dr. Younessi
documenting weakness from the waist down, chronic back and leg pain,
gait disturbance, and numbness and referring to physical therapy and
pain management specialist), AR 2303 (September 13, 2018 APS form
by Dr. Cohen reporting clinical findings of unsteady gait and lumbar
pain on palpitation), and AR 2223-2224 (May 2, 2018 progress note by
Dr. Cohen documenting back pain on movement and referring to
physical therapy for stretching and strengthening exercises and other
treatment modalities and pain management specialist). Ultimately,
Dr. Flores and Dr. Molazadeh reached many of their conclusions by
selectively focusing on certain reports in LaLonde's file (mostly from his
inmate medical records) that they deemed inconsistent with the reports
of his treating physicians. But "such inconsistencies do not
automatically negate any medical condition" at issue here, and if either
physician "wished to more persuasively articulate why such
inconsistencies demonstrated [that LaLonde] did not have functional
impairment, [he] should have explained why the more positive health
findings were more trustworthy than the more negative ones." Myers
v. Aetna Life Ins. Co., No. 19-cv-9555 DSF-KSX, 2020 WL 7423109, at
*12 (C.D. Cal. Dec. 17, 2020).

The Court disagrees with MetLife's conclusion that LaLonde's
physical conditions are no longer disabling for a variety of additional
reasons. First, MetLife overemphasizes what it deems to be
insufficient objective evidence that LaLonde's physical conditions are

severe enough to be disabling and improperly discounts the significance of LaLonde's self-reported pain.  It is widely accepted that "disabling pain cannot always be measured objectively." <u>Saffon v. Wells Fargo & Co. Long Term Disability Plan</u>, 522 F.3d 863, 873 n.3 (9th Cir. 2008).  And although it is true that self-reported symptoms are not necessarily determinative, particularly when contradicted by objective evidence, the record does not adequately establish the unreliability of LaLonde or his treating physicians.

The Court finds <u>Montour v. Hartford Life & Accident Insurance Company</u>, 588 F.3d 623 (9th Cir. 2009), instructive here.  In <u>Montour</u>, claimant Montour brought an ERISA action against plan administrator Hartford after his long-term disability benefits were terminated.  <u>Id.</u> at 626.  In deciding to terminate Montour's benefits, Hartford relied heavily on the opinions of two retained physicians, Dr. Brown and Dr. Sukhov, who had each raised questions about Montour's self-reported pain following paper-only file reviews.  <u>Id.</u> at 634.  As the Ninth Circuit explained, "[i]t would probably have been unreasonable for Hartford to require Montour to produce objective proof of his pain level, per Dr. Sukhov, or to reject his subjective claims of 'excess pain' based solely on Dr. Brown's observation" that Montour's back condition "should not cause [him] as much pain as he was reportedly suffering."  <u>Id.</u> at 635.  However, the circuit recognized that Dr. Brown and Dr. Sukhov had also observed evidence from pharmacy records indicating limited and relatively mild use of pain medication and evidence from medical records suggesting no recent engagement in pain treatment programs, and so it reasoned that those two additional "observations probably constitute[d] sufficient 'objective' evidence to support their conclusion that Montour's pain does not rise to the level of *disabling* pain."  <u>Id.</u>  By contrast, here MetLife and its retained physicians have not identified, and the Court has not found, sufficient objective evidence to support the conclusion that Montour's symptoms (including his pain) are not as severe as he claims.

Second, MetLife's arguments centering on its March 2018 surveillance findings are unpersuasive.  MetLife fails to explain why the surveillance findings should be considered evidence of "significant

functioning" that "calls LaLonde's credibility, and therefore his self-reported complaints of pain and resulting disability, into question" today when MetLife previously concluded that those same surveillance findings were "consistent with [LaLonde's] stated physical condition" and reflected ongoing functional limitations that precluded LaLonde from returning to work. Compare Dkt. 22 at 14, 21, with AR 2649 (MetLife March 21, 2018 surveillance summary concluding LaLonde's observed activity was consistent with his physical restrictions and limitations) and AR 4230-4238 (MetLife October 5, 2018 clinical assessment determining LaLonde's physical function remained "less than sedentary" and that he was unable to return to work from a physical perspective). Moreover, neither MetLife nor its physician reviewers explain how the limited activity observed during the surveillance corresponds to occupational function, and the Court sees nothing in the surveillance findings that would automatically negate LaLonde's medical conditions or occupational limitations.

Third, MetLife's argument that the "essentially normal" x-ray of LaLonde's right hip from April 2019 is evidence supporting the opinions of its independent physician reviewers and reflecting "the lack of support for the contrary opinions of LaLonde's various providers" is perplexing. See Dkt. 22 at 10, 20; see also AR 232, 4419-4420. The record is clear that LaLonde's physical disability is related to conditions of the spine (not hips) and, although he suffers from radiating pain, he consistently reports those symptoms as impacting his *left* leg, not right.

Fourth, although a claims administrator need not honor every extension request it receives, MetLife's repeated refusal to honor modest extension requests that would have afforded LaLonde's treating physicians an opportunity to respond to the contrary conclusions of MetLife's independent physician reviewers raises questions about the thoroughness and accuracy of MetLife's benefits determination in this case. At the initial termination stage, Dr. Younessi emailed MetLife after she completed her review of Dr. Flores' report to communicate her medical opinion that "the clinical picture does not support [the] independent reviewer's findings" and to request a small extension to repeat an MRI of LaLonde's lumbar spine to allow for "a more informed

decision." Id. at 1932. Because MetLife never granted Dr. Younessi's request, and terminated LaLonde's benefits shortly thereafter, any complaints by MetLife that it did not receive updated medical documentation from Dr. Younessi prior to its termination decision carry little weight. Id. at 233. At the appeal stage, MetLife did not provide the reports of its independent physician reviewers to any of LaLonde's treating physicians. Id. at 30. Instead, on June 28, 2023, MetLife sent the reports to LaLonde and asserted that his healthcare providers had until July 8 to respond—only 11 days. Id. On July 5 and 6, LaLonde called MetLife and requested an extension to afford his providers the opportunity to respond. Id. at 16. But MetLife denied the request on July 7 and notified LaLonde by letter dated July 10—only three days later—that it had completed its review of his appeal and was upholding the termination of his LTD claim. Id. at 14-16.

Finally, the Plan requires claimants to apply for SSDI benefits from the SSA and, if denied, to exhaust all possible appeals. Id. at 2651. LaLonde applied for and was awarded SSDI benefits, from which MetLife benefitted significantly as it received a financial offset that reduced its liability under the terms of the Plan. Id. at 2328. Yet, in both its initial termination decision, id. at 233, and its decision denying LaLonde's appeal, id. at 16, MetLife "acknowledged the SSA's decision but did not articulate why the SSA might have reached a different conclusion." Montour v. Hartford Life & Acc. Ins. Co., 588 F.3d 623, 635 (9th Cir. 2009).

As the Ninth Circuit has explained, although "ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'" Id. (quoting Glenn v. MetLife, 461 F.3d 660, 674 (6th Cir. 2006), aff'd sub nom. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008)).

MetLife argues the SSDI award "should be afforded little to no weight" because SSDI determinations are based on a different set of guidelines, including that the SSA is required to accord special

deference to the opinions of treating physicians whereas ERISA plan administrators are subject to no similar requirement. Dkt 29 at 16. But "this distinction alone does not provide a basis for disregarding the SSA's determination altogether, because in some cases, such as this one, the SSA deploys a more stringent standard for determining disability than does the governing ERISA plan." Montour, 588 F.3d at 636. Specifically, after twenty-four months, the Plan defines "disability" as when a claimant is unable, due to sickness or as a direct result of accidental injury, to earn "more than 60% of [his] Predisability Earnings from any employer in [his] Local Economy at any gainful occupation for which [his] [is] reasonably qualified taking into account [his] training, education and experience." PLAN 0023. By contrast, under the SSA's more exacting standard, "disability" is defined as when a claimant is unable "'to engage in any substantial gainful activity by reason of any medically determinable physical . . . impairment' that is of 'such severity that [he] . . . cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives.'" Montour, 588 F.3d at 636 (quoting 42 U.S.C. § 423(d)(1)(A), (2)(A)). "In other words, unlike the Plan, the SSA's standard does not take into account a claimant's past earnings or location." Id.

MetLife argues LaLonde's SSDI award is of "no evidentiary value" because he did not submit his SSDI claim file to MetLife, dkt. 29 at 16, but the Ninth Circuit has explained that this is also not a basis for an ERISA plan administrator to completely disregard a contrary disability determination by SSA:

> Although the Plan places the burden on [the claimant] to submit "written proof" of his disability, that is, the pertinent documents and information necessary to facilitate a disability determination, regulations promulgated by the Secretary of Labor authorize, if not require, plan administrators working with an apparently deficient administrative record to inform claimants of the deficiency and to provide them with an opportunity to

resolve the problem by furnishing the missing information. We have also construed this regulation to require a plan administrator denying benefits in the first instance to notify the claimant not just of the opportunity for internal agency review of that decision but also of what additional information would be necessary to perfect the claim.

Montour, 588 F.3d at 636 (internal citations and quotations omitted).

Although MetLife's initial decision acknowledged LaLonde's SSDI award and noted that it had not received his SSDI claim file, the letter went on to inform LaLonde that "the award of SSDI benefits does not guarantee the approval or continuation of LTD benefits under a private plan" and that the SSA's "decision is based on different standards than the Plan." AR 233.  At the appeals stage, MetLife simply parroted that same language.  Id. at 16.  This falls far short of satisfying MetLife's obligation to "set forth, in a manner calculated to be understood by the claimant . . . [a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary" in the ERISA-mandated notification of adverse benefit determination. 29 C.F.R. § 2560.503-1(g)(1)(iii); see also Collier, 53 F.4th at 1185.

The decision to completely disregard the SSA's contrary disability determination is particularly problematic here, where the basis for MetLife's termination of benefits was its determination that LaLonde did not have *any* functional limitations from a physical or psychological perspective.  AR 233; see also AR 14.  Even without the SSDI claim file, it is patently obvious that MetLife's determination that LaLonde has no functional limitations whatsoever cannot be reconciled with the SSA's determination that LaLonde satisfies the stringent federal standard for SSDI claims.  See Montour, 588 F.3d at 636 (quoting DeLisle v. Sun Life Assurance Co. of Canada, 558 F.3d 440, 446 (6th Cir.2009) ("Even though [the administrator] did not have the opinion accompanying the notice of award, it still was well aware of the uniform federal standard that applies to Social Security claims.")).

The Court finds that, on balance, the evidence weighs in LaLonde's favor, and he meets his burden of establishing his continued entitlement to LTD benefits.  A preponderance of the evidence shows LaLonde's medical symptoms related to spondylolisthesis, lumbar region status post lumbar fusion, and chronic pain render him disabled under the terms of the Plan.  Having concluded that LaLonde meets his burden of establishing continued entitlement to LTD benefits on the basis of his physical conditions, the Court need not consider the parties' arguments related to LaLonde's psychiatric conditions.

## V. Conclusion

For the foregoing reasons, the Court finds in favor of LaLonde. LaLonde is ordered to submit a proposed judgment no later than May 19, 2025.  MetLife may submit objections to the proposed judgment no later than June 2, 2025.  Counsel are ordered to meet and confer and attempt to resolve the issue of attorneys' fees and costs no later than June 30, 2025.  If no resolution is reached, LaLonde's motion for attorneys' fees must be filed no later than July 28, 2025.  The motion must comply with the requirements described in the 2021 Order re Requirements for Motion for Attorneys' Fees, which is publicly available on the district's website at https://tinyurl.com/2fzf9su2.

IT IS SO ORDERED.

Date: May 7, 2025

_____
The Honorable Dale S. Fischer
United States District Judge